**Affirmed and Memorandum Opinion filed March 26, 2015.**



In The

# Fourteenth Court of Appeals

NO. 14-13-01075-CR
NO. 14-13-01076-CR

**ELIDA HERRERA-GARCIA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 262nd District Court**
**Harris County, Texas**
**Trial Court Cause Nos. 1357627 and 1404552**

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Elida Herrera-Garcia of felony murder and injury to a child by omission. The trial court sentenced appellant to confinement for life for each offense and ordered the sentences to run concurrently. Appellant timely filed a notice of appeal in each case. On appeal, she challenges the sufficiency of the evidence to support each conviction. We affirm.

## BACKGROUND

Houston firefighters responded to a 911 call at the apartment of appellant and Maciel Sandoval and found the complainant, Sandoval's four-year-old daughter, motionless on the floor without a pulse. Efforts to resuscitate the complainant were unsuccessful and she was declared dead at the hospital. The complainant's body showed signs of extensive abuse. The cause of death was determined to be from complications arising from multiple blunt force trauma injuries. Following an investigation, both Sandoval and appellant were charged with felony murder and injury to a child.[1]

Dr. Edwina Popek, a pediatric pathologist at Texas Children's Hospital, testified at trial that the complainant's death was caused by fat emboli in her lungs. Dr. Popek explained that significant blunt trauma causes a bruise, which is bleeding into subcutaneous tissue. A severe enough injury causes the fat within the subcutaneous tissue to dislodge and move into the broken blood vessels. The fat emboli then travel in the bloodstream.

Dr. Popek testified that it takes a significant injury and a significant amount of fat within the lung to result in death, and that the complainant had many fat emboli in her lung. Dr. Popek explained that the body would try to "clean it up" and if enough time had gone by there would be inflammation around the emboli. She saw no evidence that the complainant's body had time to begin the healing process before the complainant died, however. Dr. Popek testified the fat emboli arrived in the lungs shortly before the complainant's death — within minutes to possibly hours. She stated the onset of death could have been sudden or somewhat

---

[1] Sandoval was also convicted of both offenses. *See Sandoval v. State*, 14-12-00879-CR, 2014 WL 3870504 (Tex. App.—Houston [14th Dist.] Aug. 7, 2014, no pet.) (mem. op.) (not designated for publication).

2

prolonged. During that time, there might be "gasping for breath" because the complainant could breathe in but oxygen was not getting into her blood.

Dr. Popek testified that "there would have to be substantial injury recently in order for it to cause this kind of embolization" and "in order for this to occur and result in death, this would have to have been a recent injury, but it could be on top of many, many other older injuries." Dr. Popek agreed that "there had to have been one acute injury near the time of death. Dr. Popek testified that a wooden stick found on appellant's and Sandoval's bed was the type of object capable of causing the kinds of injuries that could precipitate fat emboli in the lungs.

## STANDARD OF REVIEW

We resolve legal sufficiency challenges by considering all of the evidence in the light most favorable to the verdict and determining whether a rational jury could find each element of the offense beyond a reasonable doubt. *Temple v. State,* 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). The same standard of review is used in reviewing the sufficiency of both direct and circumstantial evidence. *Burden v. State*, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001). It is not our role to judge the credibility of the evidence presented or to substitute our evaluation of the facts for those of the jury. *Barnes v. State*, 876 S.W.2d 316, 321 (Tex. Crim. App. 1994). The jury is the sole judge of the credibility of witnesses and the weight to be given their testimony. *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Our sole duty is to determine if the explicit and implicit findings of the jury are rational when the evidence admitted at trial is viewed in a light most favorable to the verdict. *Adelman v. State*, 828 S.W.2d 418, 422 (Tex. Crim. App. 1992).

Where intent is an element of the offense, the lack of direct evidence as to intent does not render the evidence legally insufficient. *See Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). Instead, the required culpable mental state

3

may be inferred from the surrounding circumstances. *Ledesma v. State*, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984). The jury may infer intent from circumstantial evidence, such as the acts, words, and conduct of the appellant. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

## INJURY TO A CHILD BY OMISSION

In her first issue, appellant claims the State failed to establish beyond a reasonable doubt that she was guilty of injury to a child by omission. A person commits the offense of injury to a child if she "intentionally, knowingly, or recklessly by omission" causes serious bodily injury[2] to a child for whom she has assumed care, custody, or control. Tex. Penal Code Ann. § 22.04 (West Supp. 2014); *Alvarado v. State*, 704 S.W.2d 36, 38–39 (Tex. Crim. App. 1985). The State was required to prove that appellant either intended or "was aware with reasonable certainty that serious bodily injury to the [complainant] would result from her omissions." *Patterson v. State*, 46 S.W.3d 294, 302 (Tex.App.—Fort Worth 2001, no pet.).

The indictment and the jury charge included three theories by which appellant could be found guilty of intentionally or knowingly causing serious bodily injury to a child by omission: (1) by failing to seek medical attention for the complainant in a timely manner; (2) by failing to protect the complainant; or (3) by failing to adequately nourish the complainant. We hold the evidence was sufficient to support appellant's conviction for failing to seek medical attention and therefore do not reach the sufficiency of the evidence regarding the State's alternative theories.

---

[2] "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." Tex. Penal Code Ann. § 1.07(a)(46) (West Supp. 2014).

Appellant contends there was reasonable doubt of her guilt because she sought medical attention for the complainant several times when she was injured in the past and she did not intend to injure the complainant. Appellant further suggests that her failure to seek medical attention did not cause the complainant's death because the pathologist testified that the emboli were "acute" and could have killed her in a matter of minutes. Appellant does not challenge the other elements of the offense.

Admitted into evidence were five statements appellant made to police when she was questioned about the complainant's death. Taken together, those statements claim the following events occurred. Two days before the complainant's death, appellant saw the complainant was shaking and trembling and the complainant told her that she took some aspirins. Appellant said that the complainant also had a lot of diarrhea but was fine the next day.

According to appellant's statements, on the day of the complainant's death, Sandoval went to work about 8:40 a.m. Around 11:30 a.m., appellant went to bathe and left the complainant watching television in the bedroom. When appellant was finished, she found the complainant in the living room, and the complainant seemed dizzy. The complainant fell, and appellant grabbed her and spanked her to see if she responded. Appellant then put perfume on her hands and put them around the complainant's nose to see if she would wake up. The complainant "was not coming to" so appellant wet her head. When appellant saw that the complainant's teeth were clenched, she gave her mouth-to-mouth resuscitation. The complainant began to vomit juice.

Appellant's son was asleep in his room. She knocked on his door and when he came out she told him to call 911. After he dialed 911, appellant told him to hang up. Appellant said that she told her son to call 911 a total of three times but

5

that she told him to hang up all three times for "fear of CPS." Appellant's son then called Sandoval, and appellant told Sandoval that "she's dying on me." Sandoval returned to the apartment about five minutes later and called 911.

Hector Pina, an emergency medical technician with the Houston Fire Department, testified at trial that they received Sandoval's call at 12:22 p.m. and arrived at the apartment about seven minutes after the call. Thus, approximately one hour passed from the time the complainant initially passed out until Sandoval called 911. According to Dr. Popek, the emboli could have been in the complainant's lungs for hours and her death could have been "prolonged." Dr. Popek's testimony also reflects that the condition is not always fatal.

According to appellant's own statements, the complainant was ill two days before her death and appellant failed to seek medical attention. On the day of her death, the complainant passed out and could not be revived. Appellant saw a need to attempt mouth-to-mouth resuscitation. Appellant recognized the complainant's condition was critical when she told Sandoval "she's dying on me." Appellant knew the complainant needed immediate medical attention as demonstrated by her telling her son to call 911 three times. Thus, the evidence shows appellant was aware of the complainant's dire medical condition and the need for emergency assistance but took no action to obtain it.

The jury was responsible for evaluating the evidence and making the determination as to whether appellant's failure to seek medical treatment caused the complainant serious bodily injury. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (responsibility of trier of fact to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from basic facts to ultimate facts). Given the evidence that the complainant was in obvious physical distress and appellant's awareness that immediate emergency medical attention

should be sought, the jury could reasonably conclude that her failure to seek medical treatment increased substantially the risk of death. *Desormeaux v. State*, 362 S.W.3d 233, 241 (Tex. App.—Beaumont 2012, no pet.). Viewing the evidence in the light most favorable to the verdict, we hold a rational jury could have found beyond a reasonable doubt that appellant was aware with reasonable certainty that serious bodily injury to the complainant would result from her failure to seek medical attention. *See Temple,* 390 S.W.3d at 360. *See also Johnston v. State*, 150 S.W.3d 630, 636 (Tex. App.—Austin 2004, no pet.) (holding sufficient evidence showed defendant was aware of child's dire medical condition and the need to take him to the hospital); and *Payton v. State*, 106 S.W.3d 326, 330 (Tex. App.—Fort Worth 2003, pet. ref'd) (holding defendant recklessly caused child's injury when he failed to obtain reasonable medical care for child who was experiencing visible signs of medical distress). Appellant's first issue is overruled.

## FELONY MURDER

In appellant's second issue she claims the State failed to establish beyond a reasonable doubt that she was guilty of felony murder. The jury was authorized to convict appellant of felony murder if it found appellant committed the felony offense of injury to a child by striking the complainant and in furtherance of that offense committed an act clearly dangerous to human life. The charge included a parties instruction that if appellant, with the intent to promote or assist the commission of the offense, solicited, encouraged, directed, aided or attempted to aid Sandoval to commit the offense, then she was guilty as a party. We hold the evidence is sufficient to support appellant's conviction as the principal actor and therefore do not reach the sufficiency of the evidence to support appellant's conviction as a party.

7

A person commits the offense of felony murder if she commits "an act clearly dangerous to human life that causes the death of an individual" in the course of and in furtherance of the commission of a felony other than manslaughter. Tex. Penal Code Ann. § 19.02(b)(3) (West 2011). Appellant does not challenge the sufficiency of the evidence to establish that she committed the felony offense of injury to a child by striking the complainant. Rather, appellant argues only that the record contains no evidence that appellant struck the complainant in a way that was clearly dangerous to human life and that had a sufficient causal connection to her death.

The record reflects that on the day of her death, the complainant had lacerations on the base of her chin and a small laceration on the corner of her mouth. There was dried blood around them indicating they were fresh wounds. Sergeant Rodriguez testified that appellant's son told him a completely different story from what appellant said about how the complainant cut her chin. A small-sized adult shirt consistent with appellant's size was found in the hamper. Blood was found on the floor of the master bathroom and bloody toilet paper was found in the trashcan. The blood appeared to be fresh. A pair of children's panties that were stuffed down the drain of the tub had what appeared to be bloodstains on them. There was bruising on the outer part of the complainant's genitals. The blood on the floor, the toilet paper in the trash can, and the shirt in the hamper was the complainant's. The complainant's blood was also found on two napkins collected from the inside hall bathroom trash can.

Dr. Albert Chu, the assistant medical examiner at the Harris County Institute of Forensic Sciences, testified that injuries suffered by the complainant were consistent with having been struck with a stick like the one found on appellant's and Sandoval's bed the day of the complainant's death. Popek also testified the

stick was consistent with the complainant's injuries. Dr. Chu testified the complainant weighed approximately 30 pounds, placing her below the 5th percentile for weight; she was also below the 5th percentile for height. He would categorize the complainant as malnourished and she was dehydrated at the time of death.

The complainant had 21 scalp and facial contusions or bruises. The complainant had lacerations on her upper lip and lower lip and a tear of her frenulum — the membrane connecting the upper lip to the gums. Dr. Chu testified that such a tear can be caused by a blow to the mouth or forceful compression to that area. The injury was three to five days old. A tear of the mucosal layer of the lower lip was also consistent with a blow to the face — "the lip being slammed into the teeth" — and was also three to five days old. There was a healed scar on the complainant's chin, along with the fresh laceration that appeared to be three to five days old. The complainant had bleeding over the surface of her brain and a bruised cerebellum. These injuries were due to blunt force trauma to the head. Dr. Chu was unable to give an estimate of how many times the complainant's head was struck but it was more than once. The majority of these injuries were at least three to five days old.

Dr. Chu found an injury behind the complainant's left ear that was more recent — within two to three days of her death. On the right side of her scalp were four well-healed scars. Below the right side of the complainant's bottom lip was a laceration consistent with blunt force striking her in the face. Dr. Chu testified there were at least four or five contusions on the left cheek, one on the left side of the chin, and one near the left eye and they were consistent with at least four separate blows to her face.

Dr. Chu counted more than 20 contusions on the complainant's upper torso. Dr. Chu testified that it was difficult to determine if the bruising happened three or five days ago, two days ago, one day ago, or at the time of death. Dr. Chu did not rule out that other injuries occurred on top of injuries that were three to five days old. He testified that an injury could have happened ten minutes before death and he would not be able to distinguish it from the older injury. Dr. Chu did not rule out that the complainant was assaulted on the day of her death or even within one hour of death.

The complainant's back was bruised on her left shoulder, down the back of the left arm and down her right arm — these were consistent with blunt force. There was a healing injury on the top of her shoulder and a cluster of abrasions or skin scrapes on the back of her left arm. The complainant had two bruises above her genital area, also caused by blunt force. The complainant had extensive bruising over her buttocks and the area just above them. The injuries were not consistent with falling but were consistent with blunt force trauma. Dr. Chu testified that "because almost her entire buttocks were covered in bruises" it was impossible to say if it all happened at once or in the preceding few days. The oldest injury was at least three to five days old but he could not rule out more recent injuries in the same area. Underneath those areas of bruising, Dr. Chu found an avulsion pocket which he described as a tearing of the tissue to form a cavity or pocket where blood has accumulated. He agreed that it could be characterized as "liquefaction of soft tissue." That pocket means blood is not circulating in that region anymore and is therefore not able to deliver oxygen so the tissue is dead. As a result, the complainant had a widespread staph infection.

The complainant had overlapping bruises around both arms, forearms, and legs. The majority of the injuries appeared to be three to five days old, but Dr. Chu

could not rule out more recent force applied to those areas. Dr. Chu found avulsion pockets on all four of the complainant's extremities.

The complainant also had a bruise of the small intestine, the mesentery, some hemorrhage in her left adrenal gland, and fractures to both shoulder blades. The intestinal bruising was consistent with blunt force trauma to the abdomen that probably occurred within a day of her death. The bruise to the mesentery was also consistent with blunt force trauma to the abdomen but looked to be three to five days old.

The complainant's hands were covered in bruises and there was scarring on the back of both hands. The bruising on the right hand appeared to have been caused within one day of death.

Dr. Chu testified that in his opinion repeatedly striking a four-year-old child with anything, even a hand or a belt, is an act clearly dangerous to human life. Dr. Chu's testimony establishes the complainant suffered repeated blunt force trauma, and Dr. Popek's testimony summarized in the background section above demonstrates the trauma was the cause of death. Although the complainant had injuries that were three to five days old, Dr. Chu's testimony and the complainant's fresh blood found in the apartment indicated that the complainant had also suffered injuries within the day before her death. Dr. Popek testified that the trauma causing the fat emboli to travel to the lungs was a recent injury that could be on top of many other older injuries.

Given this evidence, we hold the jury would have been rationally justified in concluding that appellant repeatedly beat a four-year child, weighing only 30 pounds, and that this act is clearly dangerous to human life and caused the complainant's death. Viewing the evidence in the light most favorable to the verdict, we conclude a rational trier of fact could have found the essential elements

11

of the offense of felony murder beyond a reasonable doubt. *See Temple,* 390 S.W.3d at 360. We overrule appellant's second issue and affirm the trial court's judgments.

/s/    J. Brett Busby
          Justice

Panel consists of Chief Justice Frost and Justices Christopher and Busby.
Do Not Publish — Tex. R. App. P. 47.2(b).